HAGEDORN, J.[1]
¶1 A.J.S. appeals an order terminating his parental rights to his daughter, M.R.S. He contends that the order should be vacated because the record does not support the circuit court's finding that he voluntarily consented to terminate his rights. Because we conclude from our review of the record that A.J.S.'s consent was informed and voluntary, we affirm.
BACKGROUND
¶2 In November 2016, Walworth County Department of Health & Human Services (the County) filed a petition for involuntary termination of the parental rights of A.J.S. on the grounds of M.R.S.'s continuing need of protection or services and A.J.S.'s failure to assume parental responsibility, WIS. STAT. § 48.415(2) and (6).[2]
¶3 In August 2017, A.J.S. sought to voluntarily consent to the termination of his rights. At a hearing on the matter, A.J.S. was questioned by counsel for the County, M.R.S.'s guardian ad litem, and the circuit court.[3] Thereafter, the court found that A.J.S. "freely, voluntarily, intelligently, and understandingly" (1) waived his right to contest the petition to involuntarily terminate his parental rights and (2) consented to terminate his parental rights. The court also found that A.J.S. was informed of the nature of the proceedings, the consequences of his decision, and the alternatives to voluntary termination. After accepting A.J.S.'s consent, the court approved the termination of his parental rights.
¶4 A termination order was subsequently entered, from which A.J.S. now appeals. In particular, A.J.S. contends it is unclear from the record whether he voluntarily consented to terminate his rights.
DISCUSSION
¶5 Judicial termination of parental rights implicates a parent's fundamental rights. Evelyn C.R. v. Tykila S. , 2001 WI 110, ¶20, 246 Wis. 2d 1, 629 N.W.2d 768. "At stake for a parent is his or her 'interest in the companionship, care, custody, and management of his or her child.' " Id. (quoting T.M.F. v. Children's Servs. Soc'y of Wis. , 112 Wis. 2d 180, 184, 332 N.W.2d 293 (1983) ). Given the importance of these interests, both the state and the parent share a concern in ensuring that a decision to terminate parental rights is accurate and just. T.M.F. , 112 Wis. 2d at 185.
¶6 Under WIS. STAT. § 48.41, a parent may voluntarily consent to terminate his or her parental rights. When a parent offers consent while personally appearing at a hearing, the court may accept the consent only after it determines that the consent was informed and voluntary. Sec. 48.41(2)(a). Before making such a determination, the court must explain to the parent the effect of termination and the parent must be questioned by the court or by an attorney representing any of the parties. Id.
¶7 Whether consent to terminate parental rights has been voluntarily provided is a conclusion of law. T.M.F. , 112 Wis. 2d at 188. Nonetheless, it is also a conclusion "derived from and intertwined with the trial court's factual inquiry during which the trial court has had the opportunity to question and observe the witnesses." Id. This puts the trial court in the best position to reach an accurate and just conclusion, and therefore we give weight to that decision, even though it is not controlling on this court. Id.
¶8 Despite acknowledging that the circuit court complied with WIS. STAT. § 48.41, A.J.S. contends that its finding that his consent was voluntary is correct "only on the record and on a superficial level." A.J.S. describes the termination hearing as "muddled" and involving complicated explanations for which he lacked the education or ability to understand. He adds that the record shows his stance toward termination was "obvious and ongoing ambivalence."
¶9 While there is no set formula for ensuring that a parent's consent is informed and voluntary, at a minimum the court must ascertain the following information:
1. the extent of the parent's education and the parent's level of general comprehension;
2. the parent's understanding of the nature of the proceedings and the consequences of termination, including the finality of the parent's decision and the circuit court's order;
3. the parent's understanding of the role of the guardian ad litem (if the parent is a minor) and the parent's understanding of the right to retain counsel at the parent's expense;
4. the extent and nature of the parent's communication with the guardian ad litem, the social worker, or any other adviser;
5. whether any promises or threats have been made to the parent in connection with the termination of parental rights;
6. whether the parent is aware of the significant alternatives to termination and what those are.
T.M.F. , 112 Wis. 2d at 196-97.
¶10 In T.M.F. , the supreme court rejected a finding of consent because a "cursory and perfunctory" proceeding left the record without enough information to confirm that the consent was informed and voluntary. Id. at 195-96. "The judicial proceeding is not a mere formality; the circuit court does not simply rubber-stamp the parent's consent." Id. at 186. The particular deficiencies that were present in that case-which included, unlike here, the absence of counsel and the parent's minority-gave rise to the above-enumerated items a court must ascertain prior to accepting consent. Id. at 189-95.
¶11 We conclude that the required information was ascertained at the hearing in this case. At that time, A.J.S. was twenty-four years old with education through high school. He showed ability throughout the proceeding to comprehend and respond in an appropriate and intelligible manner to questions and explanations directed to him. He testified to his understanding of the termination proceedings; his understanding of the consequences of his decision to voluntarily terminate his parental rights, including that decision's finality; the absence of any promises or threats made against him; and his understanding of alternatives to voluntary termination, as well as the rights available to him in an involuntary termination proceeding.
¶12 After A.J.S. provided this information, the circuit court further explained to him the nature of termination proceedings and the effect of his decision to voluntarily consent to termination. The court also asked A.J.S. whether he had enough time to speak with counsel. A.J.S. used that opportunity to briefly confer with his counsel off the record. Across the hearing, A.J.S. was asked multiple times whether he had any questions or whether he was unclear about anything that had been discussed. Each time A.J.S. confirmed that he did not and that his decision was being made with clear understanding. Before the court made its findings it asked whether A.J.S. still wished to proceed with a voluntary termination of his parental rights. A.J.S. answered, "Yes."
¶13 Notwithstanding all of this, A.J.S. asserts that the circuit court failed to account for his interests and failed to adequately address the issues regarding his consent to termination. Underlying this assertion is A.J.S.'s contention that, leading up to the hearing, he understood and relied on the promise that his mother would thereafter become M.R.S.'s adoptive parent. It was not until meeting with his counsel for the first time immediately before the hearing when he was told that there was no guarantee his mother would be able to adopt M.R.S. In light of these circumstances, A.J.S. argues that the circuit court's finding must be vacated because he was not adequately informed to provide voluntary consent to the termination of his rights.
¶14 The record clearly shows that A.J.S. strongly desired for his mother to become the adoptive parent of M.R.S. The record also supports his contention that he only discovered that such an outcome was not guaranteed shortly before the hearing commenced.[4] That said, as a whole, the record establishes that the issue of this uncertainty was carefully addressed throughout the hearing and that A.J.S. wished to proceed with voluntary termination despite understanding this fact.
¶15 During the County's questioning, A.J.S. stated that he understood it was not an absolute guarantee that his mother would become M.R.S.'s adoptive parent and that he wished to proceed. At one point, A.J.S.'s mother interrupted the questioning and the circuit court offered a recess so that A.J.S.'s counsel could address the prevailing issue with her client. Counsel accepted the offer, noting that while she had already spoken with A.J.S., she wanted another opportunity given the importance of his understanding of the issue. A.J.S. characterizes the recess that ensued as "brief," "short," and a "limited amount of time" for counsel to address the underlying concern. The precise duration notwithstanding, the record shows that when the parties reconvened A.J.S.'s counsel explained that she further discussed the line of questioning with her client and stated that he wanted to proceed.
¶16 Later, the following exchange between A.J.S. and M.R.S.'s guardian ad litem reflects his understanding of the situation at hand:
Q [A.J.S.], do you think your decision is in [M.R.S.'s] best interest?
A Yes.
Q Will you tell the Court why?
A Umm-Because hopefully she gets to go with her grandmother, blood relative. That's why I believe it's in her best interest at this moment.
Q And you understand that she may not end up with ... your mom though, right?
A Yeah. Yep. I guess. I heard some situations happen that could happen-occur.
Q And you understand she's not even placed with your mom now, right?
A Yep.
¶17 Before the circuit court made its findings, A.J.S.'s mother asked for clarification on whether A.J.S. would be able to see M.R.S. after she became an adoptive parent. Prior to answering that question, the court reiterated that this outcome was not yet certain:
Let me clarify that by sort of assuming a couple facts and then taking it from there. So there's been a lot of discussion about you adopting [M.R.S.]. And let's assume for the sake of our discussion that that happens. That ultimately that's what occurs in this case, you go through a court proceeding, the judge, me or someone else, grants your right to adopt [M.R.S.], that occurs and now you're her parent from a legal perspective, okay.
Thereafter, the court confirmed that there were no other questions before A.J.S.'s counsel stated that she felt A.J.S. was making an "intelligent decision" and noted that he had asked "appropriate questions," which she had answered.[5]
¶18 To be sure, the hearing included moments where A.J.S.'s answers revealed some uncertainty of the nature of the proceeding and possible outcomes that could follow his decision. Nonetheless, the record also shows that each time such uncertainty arose it was openly confronted and carefully probed before A.J.S. confirmed that he wished to continue. A.J.S. expressed hope that his mother would become M.R.S.'s adoptive parent, but he also demonstrated that he was informed that this outcome was not guaranteed.
¶19 In total, upon our review of the proceedings and giving the appropriate weight to the circuit court's carefully considered conclusions, we conclude the circuit court's order terminating A.J.S.'s parental rights on the basis of his voluntary consent must be affirmed.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(e) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version.

The County concurrently sought to terminate the parental rights of M.R.S.'s mother on the same grounds. The resolution of those proceedings is not a subject of this appeal.

While he was incarcerated at the time, A.J.S. was able to appear in person and with counsel for the hearing.

The uncertain nature being due at least in part to the fact that, at that time of the hearing, A.J.S.'s mother was not yet able to provide placement for M.R.S. nor had formal adoption proceedings commenced given that both biological parents still possessed their parental rights.

While he disputes the voluntariness of his own consent, A.J.S. is not challenging the effectiveness of his trial counsel's performance.